# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DERRICK DIRTON        *

Plaintiff        *

v        *        Civil Action No. RDB-13-276

DR. BRUCE LILLER        *

Defendant        *

\*\*\*

## MEMORANDUM OPINION

Pending is Defendant's Motion to Dismiss or for Summary Judgment. ECF No. 14. Plaintiff opposes the motion. ECF No. 18. The Court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, Defendants' motion, construed as a Motion for Summary Judgment, shall be GRANTED.

### Background

Plaintiff Derrick Dirton ("Dirton"), an inmate confined at North Branch Correctional Institution (NBCI), alleges he has been deprived of adequate psychiatric care during his confinement at NBCI. He claims he arrived at NBCI in March of 2008 for purposes of placing him in the Behavioral Management Program (BMP). Dirton was transferred to NBCI from Maryland Correctional Adjustment Center, also known as Supermax. ECF No. 1 at p. 2.

Upon his arrival at NBCI, Dirton was assigned to disciplinary segregation and remained on that status until 2009, when he was transferred to the Special Needs Unit (SNU) for mental health reasons. Dirton claims that Defendant Liller has been aware of Dirton's mental illness since he arrived at NBCI, but has failed to provide him with adequate mental health treatment, resulting in a worsening of his condition. He further alleges that Liller has the final determination in all decisions concerning his treatment and care, but has abused Dirton by

consistently depriving him of his constitutional right to psychological care. *Id.* at p. 6. Dirton states he is prescribed psychotropic medications, but his mental illness has not been treated. *Id.* at p. 4.

Liller asserts that when Dirton arrived at NBCI it was determined Dirton was in need of psychological service and, to that end, he has been monitored by psychology department staff. Dirton's treatment includes collaboration with medical staff, individual therapy, and medication. Dirton was given the opportunity to be housed in the SNU but declined. Liller denies hindering, delaying, or otherwise denying Dirton mental health or medical care. ECF No. 14 at Ex. 1.

In a treatment summary dated April 27, 2011, which was provided to Dirton, Liller notes that Dirton was transferred to NBCI on April 18, 2008, because it was determined to be necessary to curtail Dirton's frequent, lengthy stays on disciplinary segregation. Dirton was placed on disciplinary segregation upon arrival at NBCI and remained there until April 8, 2010, when he was moved to the SNU, which Liller describes as a general population wing housing inmates with varying levels of mental illness. Dirton remained on the SNU for thirteen days and was returned to disciplinary segregation. ECF No. 14 at Ex. 1, pp. 15 -1 6.

On February 3, 2011, he was moved back to SNU where he remained at the time the summary was written. Liller noted that Dirton had made progress in the areas of anger management and self-control. In addition to the services offered through SNU, Dirton was also receiving medication from the psychiatrist as well as other medication for treatment of seizures resulting from a gunshot wound to his head prior to incarceration. Dirton's diagnosis is Bipolar Disorder which is complicated by his head injury, making it difficult to rule out an organically based mood disorder. Plans for Dirton's future treatment include a possible transfer to Roxbury Correctional Institution's SNU if he achieves medium security status as well as a review for

2

placement in the Transition Unit at Patuxent Institution within 12 to 18 months prior to his release. *Id.*

On August 16, 2011, Dirton received individual therapy from Regina M. Cubbage, LGSW, at Dirton's request. At that time Dirton reported breaking a sprinkler in his cell because he was frustrated over a disagreement he had with a nurse regarding receipt of his medication. Additionally, he related having recurring dreams of being shot and of committing suicide, but stated he had no plan to harm himself. *Id.* at p. 47.

On August 27, 2011, Dirton was seen by Dr. Howard Claudia, a psychiatrist, who reported that Dirton was experiencing auditory hallucinations and paranoia. *Id.* at p. 56. Additionally, Claudia notes Dirton's appearance as disheveled and that he was exhibiting signs of psychosis without signs of mania. At the time, Dirton's thought process was described as revealing paranoia and delusions. It was also noted that Dirton was compliant with prescribed medication at that time. *Id.* at p. 60. Claudia's plan instructions included an increase in Dirton's Cogentin prescription to address complaints of neck stiffness, and a re-evaluation the following week to address persistent paranoia. Additionally Claudia notes, "Inmate presents as hyperverbal, happy, and curious, despite his statement that he is depressed." *Id.* at p. 61.

On September 2, 2011, it was noted that Dirton experienced auditory and visual hallucinations, but that his thought processes were logical and he was not expressing suicidal or homicidal ideation. *Id.* at p. 68; *see also id.* at p. 76. On September 13, 2011, Dirton was seen by Laura Moulden, LCPC, and discussed issues he was having regarding receipt of his medication. Moulden asked Dirton how staff could deliver medications to Dirton without causing him to complain, but he did not offer a suggestion to resolve the problem. Moulden states that staff have attempted to resolve the issues with Dirton repeatedly, but "he will create

dynamics with the nursing staff no matter what the situation." *Id.* at p. 71. In addition, Moulden notes that Dirton "will make complaints about certain nurses and that they aren't watching him properly or something very trivial." *Id.* When Moulden attempted to discuss Dirton's informal complaints he had written, she noted that his responses were not relevant to the topics of the complaint. *Id.* On October 3, 2011, Moulden again discussed medication issues with Dirton at the request of Lt. Harbaugh. *Id.* at p. 81. Dirton claimed the medical technicians were not doing their jobs and were giving him the wrong medications. Moulden suggested that Dirton keep a daily log concerning the medication issues and asked Harbaugh to see if his staff could write information reports when there was an obvious problem. *Id.* At a subsequent meeting with Moulden on October 11, 2011, Dirton told her he did not want her help, became argumentative and defensive whereupon he was dismissed from Moulden's office. *Id.* Shortly therafter Dirton was seen by the psychiatrist, to whom Dirton reported that his medication helps him act out less often and that he does not "go off" as often, but complained that he does not always receive his medication. *Id.* at p. 86.

On November 7, 2011, Dirton refused to see Moulden for individual therapy. *Id.* at p. 103. On November 18, 2011, Dirton could not be seen for therapy because he was destroying his cell and "scratched the window so much that you could not see into his cell." *Id.* at p. 104. When Dirton was ordered to allow security to handcuff he refused and a cell extraction team was formed; however, Moulden convinced Dirton to submit to handcuffing. She noted Dirton would be seen when his behavior improved. *Id.*

On December 2, 2011, Dirton was seen again for individual therapy and was described as alert, oriented, and verbally expressive. He spent most of the session complaining about medications and agreed to refrain from engaging in negative behavior. *Id.* at p. 105. A notation

4

from the Behavioral Health Segregation unit notes Dirton completed the sixth and seventh units of "Taking a Chance on Change" program on December 20, 2011. *Id.* at pp. 108 - 9. Nine days later, however, Liller was required to intervene in an incident where Dirton had smeared butter on the cell windows in a holding cell, but quickly cleaned it off when he understood force might be used. *Id.* at p. 110.

In February 2012, Dirton began reporting that his insomnia was contributing to thoughts he was having about doing harm to his cellmate. *Id.* at pp. 113 – 16. Dirton was seen by Dr. Schellhase on February 22, 2012, to discuss his complaints of insomnia and it was agreed Dirton would be provided with Benadryl in place of Cogentin to address the issue. *Id.* at p. 121. Later in individual therapy, Dirton voiced no plan to harm another individual.

On March 21, 2012, Dirton was again seen for individual counseling and the plan was for him to continue seeing the counselor, Regina Cubbage, on a weekly basis. *Id.* at p. 137. The following week, however, Dirton refused to see Cubbage again because he believed he should be seen by Liller, a psychologist. *Id.* at p. 138. On that date he was required to wait in the hallway to see Cubbage for approximately 30 seconds and demanded to be taken back to his cell by the escorting officers because he did not want to wait in the hallway. *Id.* at p. 139. Dirton continued to be seen by Cubbage on subsequent weeks. *Id.* at pp. 140, 142- 4. His therapy sessions with Cubbage ended on April 24, 2012, after Dirton exposed himself to her during a session. *Id.* at p. 144. Cubbage notes that security staff agreed that Dirton should no longer be offered individual counseling in light of his behavior. *Id.*

Approximately one month after the incident with Cubbage, Dirton was seen by Liller, who noted that Dirton's behavior was stable for approximately four months and future plans for treatment, including a transfer to the SNU, were discussed. *Id.* at p. 145. When Liller saw

5

Dirton on June 22, 2012, he noted Dirton was alert, cooperative, and organized in his thoughts and speech. Dirton expressed his desire to come back to the SNU and Liller noted that planning for his return had begun with an anticipated return in the next two weeks. Additionally Liller discussed a possible psychological assessment in order to identify the quality of Dirton's cognitive functions. *Id.* at p. 157. On August 10, 2012, Dirton refused to meet with Liller and had refused to attend a SNU review two days before. *Id.* at p. 171. Liller noted that Dirton would be reminded of the expectations that he would cooperate with treatment if he were moved back to the SNU. *Id.*

On August 24, 2012, Dirton reported continued problems with sleeping and that he was experiencing constant mood swings. Additionally, he claimed he was having auditory hallucinations throughout the day and night. While Dirton complained about receiving his medication, he refused lab tests that morning. Dosages of several of his medications were increased to address his complaints, though Dirton did not appear to be internally distracted. *Id.* at p. 174.

On September 18, 2012, Dirton reported to Dr. Schellhase that "his current medications are working pretty well for him and he wants to continue with the same medications." *Id.* at p. 191. Less than one month later, on October 12, 2012, Dirton reported to medical that he did not want to take one of his medications because he believed he was on too many medications. *Id.* at p. 202. Dirton was seen by a Nurse Practitioner on October 15 and 27, 2012, regarding his request for his medications to be decreased. *Id.* at pp. 209 and 217. Dirton related that he wanted his psychiatric medications changed because he believed Trilafon was being used to control his behavior. *Id.* at p. 217. It was explained to Dirton that Trilafon was prescribed to help with mood and psychosis, specifically Dirton's reported auditory hallucinations. Dirton

6

requested something better to help with his anger and he was told the medications were only an adjunct to therapy and the use of anger management techniques were important. After discussing the issues with Dirton, some of his medications were adjusted,[1] he was reminded of the importance of compliance with the prescriptions and a follow-up visit was planned for two months. *Id.*

Despite the adjustments in his medication made at Dirton's request, his chief complaint when meeting with Liller on December 7, 2012 was his opinion the medical department was not managing his medication properly. *Id.* at p. 233. Liller noted that at the time of Dirton's therapy, he was handcuffed because disciplinary action was pending against Dirton for assaulting an officer. *Id.* Liller states that despite the alleged assault, Dirton had become less disruptive overall. *Id.* Dirton was seen on the same day by the Nurse Practitioner, to whom he related that the new medication was helping with his mood and that he felt calmer despite his continued behavioral problems. *Id.* at p. 235. Dirton expressed concern, however, that the medications may be increasing his seizures and related he had three seizures in the past week. *Id.* Dirton also reported neck spasms and facial twitching. *Id.* To address these issues Cogentin was added back to Dirton's medications and Vistaril was decreased. *Id.*

Dirton was seen again by the Nurse Practitioner on December 21, 2012, for complaints that his hands were shaking and at times waking him up. Additionally, he stated he was feeling suicidal recently with auditory hallucinations telling him to cut or hang himself or to take an overdose. At the time of the appointment he claimed he was not having such thoughts. Dirton

---

[1] The specific plan instructions were to start Risperdal for treatment of paranoia and auditory hallucinations; decrease Trilafon; and add Vistaril in the morning for treatment of anxiety. ECF No. 14 at Ex. 1, p. 223.

was noted as being compliant with medications and dosages[2] were again adjusted to address his concerns. *Id.* at p. 253. When Dirton was seen for a follow-up appointment he reported that the auditory hallucinations had worsened and that he felt depressed. He also stated that the tremors in his hands were worsening and that he experienced tight spasms in his neck. Dirton's medication was again adjusted. *Id.* at p. 262. By January 29, 2013, when Dirton was seen by Dr. Schellhase, it was noted that he was not experiencing depression, mania, or psychosis and that he appeared to be functioning at his baseline. *Id.* at p. 268.

On February 11, 2013, Liller noted that Dirton was then assigned to the SNU even though he did not want to participate. Dirton expressed his desire to be discharged from the SNU, stating he believed he should be treated in a different facility other than NBCI. *Id.* at p. 276.

On April 16, 2013, Dirton was seen by the Nurse Practitioner where he discussed at length his unhappiness with missing several doses of medication over the past few weeks for unknown reasons and indicated that he felt fine if he received his medication as scheduled. Dirton's mood was pleasant and he was alert with a normal affect. *Id.* at p. 306.

On April 29, 2013, Dirton was seen by Liller for individual therapy and Dirton's history was reviewed. Dirton's diagnosis of non-organic psychosis was "resolved." Liller notes that examination of the behavioral, cognitive, and physical effects of the gunshot would to Dirton's head supports a finding that a personality change occurred as a result of the general medical condition. *Id.* at p. 316.

---

[2] Risperdal was increased and Trilafon was decreased. A possible plan was noted to eliminate Trilafon if the Risperdal was effective in decreasing the tremors. It was also noted that the hand tremors Dirton was experiencing may be due to head trauma. *Id.* at p. 260.

8

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

The record before the Court reflects vigilance in the efforts to treat Dirton's serious psychological and behavioral issues. Despite Dirton's recalcitrant behavior, he continues to receive individual therapy when he agrees to it. Each time he has expressed concern about his medications, those concerns have been addressed by medical staff. To the extent Dirton's psychological condition remains troubling, it has not degenerated as a result of deliberate indifference to his need for treatment. Dirton's belief that he should be housed at a different facility is in essence a disagreement with decisions regarding his care and cannot form the basis for an Eighth Amendment claim. Dirton claims that Defendant's actions violate Maryland state law, but he does not state what the regulations[3] he references require that he is not receiving. In any event, there is no evidence that Dirton's Eighth Amendment rights have been abridged and Defendant is entitled to summary judgment in his favor.

9/3/13
Date

_____/s/_____
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[3] Dirton's claim is vague inasmuch as he neither provides a citation to the regulations he references, nor provides the content relevant to his claim. A review of the applicable regulations for correctional facilities reveals none which are specific to prisoners with psychiatric illness. To the extent Dirton relies on regulations governing the Department of Mental Health and Hygiene, he is not confined in a facility controlled by those regulations or that agency.